NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0701n.06

No. 12-2594

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 08, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,               )
                                        )
        Plaintiff-Appellee,             )
                                        )
v.                                      )
                                        )       ON APPEAL FROM THE UNITED
                                        )       STATES DISTRICT COURT FOR THE
JONAS ROGERS,                           )       EASTERN DISTRICT OF MICHIGAN
                                        )
        Defendant-Appellant.            )
                                        )
                                        )

BEFORE:  DAUGHTREY, McKEAGUE, and DONALD, Circuit Judges

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Defendant Jonas Rogers, having been convicted of money laundering and conspiracy to commit wire fraud, raises multiple challenges both to those convictions and to the concurrent 78-month prison sentences imposed by the district court.  Specifically, Rogers argues that the district court:  (1) should have granted his motion for a judgment of acquittal based on insufficient evidence of fraud; (2) erred in failing to issue subpoenas for three out-of-state witnesses whose appearances at trial Rogers wished to secure; (3) failed to instruct the jury properly on the elements of the offense of conspiracy to commit wire fraud; (4) erred in enhancing Rogers's offense level for serving as the organizer, leader, manager, or supervisor of criminal activity; (5) improperly enhanced Rogers's offense level for possession or use of an authentication feature; and (6) imposed a sentence at the high

end of the applicable Sentencing Guidelines range that was procedurally and substantively unreasonable. We find each of these issues to be without merit and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In early May 2007, Margaret Kryvicky, the secretary of the Woodlands Estates Homeowners Association in Bloomfield Hills, Michigan, received a check from a title insurance agency for $3,420 as payment for delinquent association fees due from the owner of property located at 5328 Woodlands Estates Drive. Because the check was issued by a title company, Kryvicky assumed that the property for which the dues were paid had been sold. She thus contacted Dr. Mark Fireman, the person whose name was listed on the check stub, to inform him of deed restrictions and by-laws that applied to the newly acquired property. When she did so, however, Fireman informed her that he had "never bought a house in Woodlands." Concluding that someone had stolen his identity in order to purchase the home, Fireman then contacted the Huntington Woods Police Department to report the impersonation. Eventually, the local police transferred the matter to the Federal Bureau of Investigation (FBI), and that agency's investigation uncovered the facts behind the home purchase.

According to Valeria Bracken, an individual identified during the investigation, she and her "God brother," Jonas Rogers, collaborated on real-estate investment projects in which the two close friends would purchase property, rent it to other individuals, and then profit from the rental income. Bracken testified that Rogers would identify the target properties, select a mortgage company, and negotiate a price for the property before using Bracken's name and credit-worthiness to purchase the home. Eventually, Bracken and the defendant sought to purchase the home located at 5328 Woodlands Estates Drive in Bloomfield Hills.

Although the property was listed for sale at $1,100,000, Rogers negotiated a sale price of $799,000 and, without Bracken's input, selected a mortgage company willing to finance Bracken's purchase of the home, despite the fact that Bracken had annual employment income of only $40,000 as a supportive-services case manager for the Arab-American and Chaldean Council. At the designated time, Rogers then drove Bracken to Decision One Mortgage Company for the closing where Bracken signed two Uniform Residential Loan Application forms, one for a $639,200 mortgage and the other for a $159,800 mortgage. Even though Bracken had never spoken to or been questioned by a mortgage official concerning her income or her employment, both applications indicated that she was employed not only by the Arab-American and Chaldean Council, but also by 3 Marketeers Production, a company of which Bracken had never heard. Both applications listed Bracken's *monthly* employment and rental income at $22,809 and indicated that she had two separate bank accounts with balances of $20,000 each. Although Bracken had not supplied any of the blatantly inaccurate information, she signed the loan applications and settlement statement on September 8, 2006, in order "[t]o get the deal done." Relying on the information "provided" by Bracken, Decision One Mortgage Company then wired the requisite funds to a Michigan escrow account from Decision One's headquarters in Charlotte, North Carolina.

At the closing, the sellers transferred to Bracken a check for $11,000, which she then gave to the defendant. Moreover, although Bracken was listed as the purchaser of the house at 5328 Woodlands Estates Drive, she never moved into the dwelling. Instead, defendant Rogers took up residence there in order to "fix[ ] up the property."

Not surprisingly, given Bracken's actual annual income, she was unable to make the mortgage payments on the house or to keep current on the monthly homeowners-association fees

on the property. According to Bracken, however, Rogers claimed that he fortuitously was contacted by numerous people—including a Dr. Mark J. Fireman, Jr.—interested in purchasing the property, even though the house was never listed for sale, even though access to the neighborhood was restricted by a guarded gate, and even though "there was never a For Sale sign at the house." Rogers then made all the necessary arrangements for Bracken to sell the property to Fireman, purportedly negotiating the sale price and then selecting Vanguard Title Company as the closing agent. Indeed, when Bracken arrived at Vanguard on April 30, 2007, for the closing, a settlement statement for the sale of the property by Bracken to Fireman for $1,100,000, exclusive of settlement charges and taxes, had already been prepared.

On that closing day, all signs pointed to the prospect that Rogers and Bracken would profit handsomely from their scheme. The identified buyer, Mark J. Fireman, Jr.[1], was to bring with him to the closing a downpayment check for $122,814.67, which, together with funds provided by Credit Suisse Financial Corporation of New Jersey, would lead to issuance of a settlement check to Bracken in the amount of $185,600.79. However, the man who identified himself as Fireman did not bring the $122,000 check with him. Nevertheless, the title company president claimed that "the buyer and the seller had worked things out and were going to take care of settling up outside of the closing." Thus, Vanguard simply provided Bracken with a check for $62,786.12, the difference between the amount she was scheduled to receive and the amount of the downpayment check that the buyer failed to provide.

Three days later, on May 3, 2007, at the direction of Rogers, Bracken deposited the closing check into her personal account at National City Bank. Almost immediately, again at

---

[1]"Mark J. Fireman, Jr.," was actually Mark Freeman, a six-foot tall African-American man from Pontiac, Michigan. By contrast, the real Mark Jay Fireman was not a "Jr.," was five-feet ten-inches tall, Caucasian, and, at that time, a resident of Huntington Woods, Michigan.

Rogers's direction, she began writing checks to herself, to "cash," and to Ernestine Rogers, the defendant's mother. Between May 7, 2007, and May 17, 2007, Bracken wrote the following checks from her account:

> May 7, 2007 – check 2947 to Ernestine Rogers for $4,900;
> May 14, 2007 – check 2948 to Ernestine Rogers for $6,000;
> May 14, 2007 – check 2950 to Valeria D. Bracken for $20,000;
> May 16, 2007 – check 2952 to Ernestine Rogers for $7,000;
> May 16, 2007 – check 2953 to Ernestine Rogers for $3,000;
> May 17, 2007 – check 2954 to Cash for $21,766.

Bracken testified at trial that four of the checks were made out to Rogers's mother because Rogers himself did not have a bank account. Each of those checks was handed directly to Rogers to give to his mother to cash. Rogers also directed Bracken to cash the two checks for $20,000 and $21,766 and hand the proceeds directly to him. Thus, by May 17, 2007, all but $120.12 of the $62,786.12 issued to Bracken at the closing of the sale of the Woodlands Estates property had been delivered to Rogers and converted to cash.

Based upon this information, the government charged Rogers with: (1) conspiring "with others known and unknown" to commit wire fraud; (2) laundering the proceeds of that unlawful activity; and (3) aiding and abetting the theft of Mark Fireman's identification. After a multi-day trial, the jury convicted Rogers of conspiracy to commit wire fraud and of money laundering, but acquitted him of the aggravated-identity-theft charge.

The district court sentenced Rogers to concurrent 78-month prison terms to be followed by 36 months of supervised release, and ordered him to pay $535,000 in restitution to Credit Suisse and $134,500 in restitution to the real Mark Jay Fireman, whose identity was stolen in the

perpetration of the charged criminal activities. Rogers now appeals, challenging aspects of both his conviction and his sentence.

## DISCUSSION

## I. Denial of Rule 29 Motion for Acquittal

Rogers first takes issue with the district court's denial of his motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. We review *de novo* the denial of such a motion. *See, e.g., United States v. Ramirez*, 635 F.3d 249, 255 (6th Cir. 2011).

Pursuant to Rule 29(a), a "court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Consequently, "the relevant question" for us on appeal is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making such an assessment, we may rely upon circumstantial evidence alone to support the jury verdict, *see United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005), but we may not substitute our judgment for that of the jury, *see United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). A criminal defendant faces a "very heavy burden" in attempting to overturn the denial of a Rule 29 motion. *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (citations omitted).

### A. Conspiracy to Commit Wire Fraud

Wire fraud, as criminalized by the provisions of 18 U.S.C. § 1343, consists of three elements. The prosecution must establish "that the defendant devised or willfully participated in

a scheme to defraud[,] that he used or caused to be used an interstate wire communication in furtherance of the scheme[,] and . . . that he intended to deprive a victim of money or property." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (internal quotation marks omitted) (quoting *United States v. Prince*, 214 F.3d 740, 747-48 (6th Cir. 2000)), *cert. denied*, 133 S. Ct. 252 (2012). Because Rogers was charged with *conspiracy* to commit wire fraud, 18 U.S.C. § 1349, the government also was required to establish beyond a reasonable doubt that "two or more persons conspired, or agreed, to commit the crime of [wire fraud]"and "that the defendant knowingly and voluntarily joined the conspiracy." *See* Sixth Circuit Pattern Criminal Jury Instruction 3.01A.

Rogers insists that no reasonable jury could have convicted him of conspiracy to commit wire fraud because "there was simply no evidence to show that any agreement to commit wire fraud ever occurred, nor that there was an intent to defraud on the part of either Mr. Rogers or Ms. Bracken." His contention on this point is premised upon a narrow interpretation of the trial testimony, which the jury declined to adopt. At the very least, Rogers and Bracken knowingly and voluntarily agreed to purchase the Woodlands Estates home as investment property. Rogers and Bracken also knew that they would not qualify for $799,000 in mortgage obligations on Bracken's $40,000-per-year salary. Consequently, a rational fact-finder, examining the circumstantial evidence offered at trial, could well have concluded that Rogers contacted a mortgage company and agreed with one or more individuals employed there to enter falsified income figures on Bracken's loan application in order to obtain the requisite financing. Indeed, Bracken testified that she never spoke to the mortgage officials prior to signing the closing documents; therefore, the jury reasonably concluded that those inflated figures had to have been provided by Rogers himself. Furthermore, the fact that the falsified loan application was

accepted by the mortgage company indicates either that the loan officials agreed with Rogers not to verify the information provided, or that the officers at 3 Marketeers Productions, the business incorrectly listed as Bracken's main employer, agreed to lie to the mortgage officers who would check with them about Bracken's falsely reported $21,000-per-*month* salary.

Moreover, the loan application indicated that Bracken had two separate accounts at National City Bank, each with a balance of $20,000. Again, presented with proof of that false information, the jury could rationally believe that the mortgage company either agreed not to perform the most basic of verifications with that bank, or that bank employees agreed with Rogers to provide false information to the lenders. In either event, there was ample evidence for the jury to draw the reasonable inference that Rogers had conspired with at least one other individual with the intent to obtain $799,000 through wire transfers under blatantly false pretenses. The district court did not err in denying the defendant's motion for a judgment of acquittal on the conspiracy count of the indictment.

### B. Money Laundering

Piggybacking upon his challenge to the sufficiency of the evidence of conspiracy to commit wire fraud, Rogers contends that without evidence that he committed that illegal act, the subsequent monetary transactions in which he and Bracken engaged cannot support his conviction for money laundering. However, the provisions of 18 U.S.C. § 1957 impose criminal penalties upon an individual who, while in the United States, "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." As previously discussed, the government adduced sufficient evidence in this matter to justify a rational trier of fact in concluding that

Rogers aided Bracken in obtaining more than $62,000 in real-estate settlement payments by participating in the preparation of false, fraudulent loan applications and acquiescing in the transfer of property to an individual who used a stolen identity. Subsequently, at Rogers's direction, Bracken engaged in numerous monetary transactions whereby the proceeds of their fraudulent real estate transactions were deposited into Bracken's own bank account, disbursed to Rogers's mother, and finally, to Rogers himself in cash. In light of these facts, the district court did not err in concluding that a rational jury could find Rogers guilty of money laundering beyond a reasonable doubt.

## II. Denial of Motion for Issuance of Witness Subpoenas

Five days before the start of the jury trial in this matter, Rogers requested that the district court issue subpoenas to secure the presence of three out-of-town witnesses who were purportedly beneficial to his defense. The district court denied his request, however, and Rogers now asserts that the denial hampered his ability to present an adequate defense.

We review such a decision only for an abuse of discretion. *United States v. Guthrie*, 557 F.3d 243, 251 (6th Cir. 2009). The district judge has wide discretion in such matters, "and 'a reviewing court should not reverse unless the exceptional circumstances of the case indicate that [the] defendant's right to a complete, fair and adequate trial is jeopardized.'" *Id.* (quoting *United States v. Rigdon*, 459 F.2d 379, 380 (6th Cir. 1972)).

Rule 17(b) of the Federal Rules of Criminal Procedure provides explicitly that "[u]pon a defendant's ex parte application, the court *must* order that a subpoena be issued for a named witness if the defendant shows an inability to pay the witness's fees and the necessity of the witness's presence for an adequate defense." (Emphasis added.) However, in his effort to

demonstrate "the necessity of the witness[es'] presence" at his trial, Rogers made only the following allegations:

> The testimony of [Thomas Horn, Stacy Tucker, and Peter Theodorakakos] is relevant to the incident as they could shed light to the jurors as to other parties' involvement; and/or provide alternate motives of the events as well as to provide supporting testimony to defendant's position regarding the events that occurred in this matter. Additionally it is believed that at least one of the named persons maybe [sic] able to shed light on the whereabouts of the allusive [sic] Mr. Mark Freeman who was present at the closing in question.

As noted by the district court, this conclusory statement failed to establish "the necessity of the witness's presence for an adequate defense" before a subpoena must issue. The motion contained only broad, nonspecific statements about the witnesses and their usefulness and "fail[ed] to in any way describe: who the Witnesses are; what their relation is to this case; what 'position' they will support; and what they will testify to." Additionally:

> [T]he statement that it is "*believed* that *at least one* of the [Witnesses] *may*[]be able to shed light" on the whereabouts of Mr. Mark Freeman is insignificant, as it lacks any specificity or supporting information. Defendant fails to explain who Mark Freeman is, why he is significant, or what relevant evidence he could provide to the case. That is, of course, assuming that any of the Witnesses could actually identify Freeman's whereabouts, which Defendant seems unwilling to affirm. Purportedly offered to support Defendant's motion, Defendant's claimed "belief" that "at least one" Witness "may" be able to locate Freeman is, at best, speculation.

In short, "Defendant made only generalized assertions and . . . did not make factual averments about the content of the Witnesses' testimony." Consequently, the district court did not abuse its "wide" discretion in denying the motion prior to learning how the proposed witnesses' testimony would benefit Rogers's defense.

**III. Lack of Jury Instruction on Necessity of Overt Act in Furtherance of Conspiracy**

When instructing the jury on the elements of the crime of conspiracy to commit wire fraud, the district court explained:

> For you to find the defendant guilty of the conspiracy charge, the Government must prove each of the following elements beyond a reasonable doubt. First, that two or more persons conspired or agreed to commit the crime of wire fraud. And, second, that the defendant knowingly and voluntarily joined the conspiracy.

Even though Rogers did not object to that charge at the time it was given, he now argues that the instruction erroneously omitted "the requirement of an overt act by any member of the alleged conspiracy" in furtherance of the criminal collaboration.

Given the defendant's failure to raise a timely objection to the instruction, our review is for plain error only. *See, e.g., United States v. Daniels*, 653 F.3d 399, 409 (6th Cir. 2011). "An instruction is not plainly erroneous unless there was an egregious error, one that directly leads to a miscarriage of justice." *United States v. Yang*, 281 F.3d 534, 551 (6th Cir. 2002) (citations and internal quotation marks omitted). We conclude that the district court did not commit any error, plain or otherwise, in instructing the jury on the essential elements of the conspiracy charge.

Rogers relies upon this court's opinion in *United States v. Cunningham*, 679 F.3d 355 (6th Cir. 2012), *cert. denied*, 133 S.Ct. 1584 (2013), to support his argument that the crime of conspiracy to commit wire fraud requires commission of an overt act that must be found by the jury beyond a reasonable doubt. It is true that in *Cunningham* we stated:

> To secure a conviction for conspiracy to commit wire fraud, the government must prove beyond a reasonable doubt that the defendant "knowingly and willfully joined in an agreement with at least one other person to commit an act of [wire] fraud *and that there was at least one overt act in furtherance of the agreement*."

-11-

> *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005) (internal quotation marks omitted).

679 F.3d at 373 (emphasis added). Moreover, we have mentioned the need for proof of an overt act in other decisions involving charges of conspiracy to commit wire fraud. *See, e.g., United States v. Crosgrove*, 637 F.3d 646, 651 (6th Cir. 2011); *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010); *Faulkenberry*, 614 F.3d at 584. However, a closer examination of each of those cases reveals that Rogers's contention in this regard is incorrect, because a conspiracy under 18 U.S.C. § 1349 does not require proof of an overt act in furtherance of the agreement in order to convict a defendant of the conspiracy offense.

Prior to 2002, most federal conspiracy offenses were charged under the provisions of 18 U.S.C. § 371, which imposed a maximum five-year prison sentence "[i]f two or more persons conspire[d] either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, *and one or more of such persons [did] any act to effect the object of the conspiracy*." (Emphasis added.) In 2002, however, Congress enacted 18 U.S.C. § 1349, which provides that "[a]ny person who attempts or conspires to commit any offense [involving mail fraud or one of various other fraud offenses] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Thus, under 18 U.S.C. § 1349, the maximum penalty for conspiracy to commit wire fraud increased from the five-year maximum of 18 U.S.C. § 371 to 20 years. *See* 18 U.S.C. § 1343. Additionally, for purposes of prosecution under § 1349 the overt-act requirement of § 371 was eliminated.

The Committee Commentary to Sixth Circuit Pattern Criminal Jury Instruction 3.01A recognized as much when it instructed district courts to delete all references to overt acts in

pattern instructions involving statutes that "contain their own separate conspiracy provisions that do not require an overt act," including 18 U.S.C. § 1962(d) (RICO conspiracy), 21 U.S.C.§ 846 (controlled substances conspiracy), and "18 U.S.C. §§ *1349*, 1951, 1956(h)." (Emphasis added.) Furthermore, the United States Supreme Court has disavowed the need for proof of an overt act in furtherance of conspiracies with language that is substantively identical to that found in 18 U.S.C. § 1349. *See Whitfield v. United States*, 543 U.S. 209, 219 (2005) ("[W]e hold that conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h)[2], does not require proof of an overt act in furtherance of the conspiracy."); *Salinas v. United States*, 522 U.S. 52, 63 (1997) ("There is no requirement of some overt act or specific act in the [RICO] statute[3] before us, unlike the general conspiracy provision applicable to federal crimes . . . ."); *United States v. Shabani*, 513 U.S. 10, 17 (1994) ("[P]roof of an overt act is not required to establish a violation of 21 U.S.C. § 846.[4]").

Moreover, on closer inspection, we note that our prior decisions requiring proof of an overt act in wire-fraud conspiracy cases cannot be read to contradict the Supreme Court's guidance on this subject. In *Faulkenberry*, for example, although we mentioned the government's need to prove an overt act in furtherance of an alleged conspiracy to commit securities and wire fraud, that conspiracy was charged under the provisions of 18 U.S.C. § 371, which requires an overt act, not under 18 U.S.C. § 1349, which does not. *Faulkenberry*, 614 F.3d at 584.

---

[2]In its entirety, 18 U.S.C. § 1956(h) provides, "Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

[3]The RICO statute at issue, 18 U.S.C. § 1962(d), provides, "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

[4]The drug conspiracy statute, 21 U.S.C. § 846, provides, "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

In *Warshak*, even though the defendant was indicted under the provisions of 18 U.S.C. § 1349, we did note that a conviction pursuant to that statutory section "requires proof beyond a reasonable doubt that . . . there was at least one overt act in furtherance of the agreement." *Warshak*, 631 F.3d at 308. However, to support that proposition, we cited *United States v. Cantrell*, 278 F.3d 543, 546 (6th Cir. 2001), and *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000), two cases involving crimes committed *prior to* the 2002 enactment of 18 U.S.C. § 1349. Consequently, it is clear that we misstated the relevant law in *Warshak* by citing to requirements applicable to a statute not at issue in that case, requirements that had been superseded by statute *after* the release of the *Crossley* and *Cantrell* decisions and more than eight years *before* our *Warshak* opinion. *Warshak*'s attempt to define § 1349 elements by reference to § 371 provisions thus was inapposite and cannot serve as guidance in subsequent cases challenging § 1349 convictions.

Nor does our statement in *Crosgrove* that the indictment in that case "identified several overt acts in furtherance of the mail/wire fraud conspiracy," *Crosgrove*, 637 F.3d at 651, indicate that the government was required to establish such facts in Rogers's prosecution. Crosgrove was indicted for conspiracy to commit mail/wire fraud under 18 U.S.C. § 371, not 18 U.S.C. § 1349, thus necessitating proof of an overt act, but also limiting Crosgrove's maximum punishment for conviction under that statute to five years in prison.

Finally, *Cunningham*'s listing of an overt-act requirement for conviction of conspiracy to commit wire fraud under 18 U.S.C. § 1349 is not binding on us in this case. First, Cunningham did not challenge the sufficiency of the evidence at trial; consequently, any listing of the elements of the crime was purely *dicta*. Second, as support for its statement that the government was required to prove commission of overt acts, the *Cunningham* opinion cites our prior decision

in *United States v. Jamieson*, 427 F.3d at 402.  However, *Jamieson* is sufficiently distinguishable from *Cunningham* that the latter case should not have relied upon *Jamison* for the proposition cited.  Importantly, the conspiracy alleged in *Jamieson* ran from December 1996 until May 2000.  Thus, the provisions of the 2002 enactment of § 1349, the statutory provision at issue in *Cunningham* could not have been applied to Jamieson's prosecution.  Indeed, our opinion in *Jamieson* makes clear that the defendant in that case was convicted for conspiracy under the general conspiracy provisions of 18 U.S.C. § 371, which, as we have noted, *does* contain an overt-act requirement that is not found in 18 U.S.C. § 1349.  *Jamieson*, 427 F.3d at 402.

The United States Supreme Court and the Sixth Circuit's Pattern Criminal Jury Instructions both recognize that juries need not find proof of an overt act in a conspiracy charged under a statute does not list an overt act as an element of the offense.  We have usually applied the overt-act requirement only in cases in which the defendant is indicted under the general conspiracy statute, 18 U.S.C. § 371.  In those few cases in which we have erroneously applied § 371 principles to § 1349 charges, however, the error was based upon language taken from pre-§ 1349 decisions.  In any event, it is now clear that a conspiracy charged under 18 U.S.C. § 1349 does not require independent proof of an "overt act."  Consequently, the district court did not err in omitting the overt act language associated with general conspiracies under 18 U.S.C. §371 in its jury instruction on conspiracy to commit wire fraud under 18 U.S.C. § 1349.

## IV. Application of USSG § 3B1.1(c) Enhancement

At sentencing, Rogers's base offense level was increased two levels because the district court determined that he "was an organizer, leader, manager, or supervisor in [a] criminal activity."  USSG § 3B1.1(c).  Rogers contends, however, that the district court's determination

that Rogers "played a leadership role in the offense was clearly erroneous." We review "the legal conclusion that a person is an organizer or leader under Section 3B1.1" deferentially, "[i]n light of the fact bound nature of the legal decision." *United States v. Washington*, 715 F.3d 975, 982-83 (6th Cir. 2013) (quoting *Buford v. United States*, 532 U.S. 59, 66 (2001)).

The thrust of Rogers's argument on this issue is that he cannot be considered an organizer, leader, manager, or supervisor because he was no more culpable than Bracken in their agreement to purchase the Woodlands Estates home as investment property. What Rogers fails to appreciate, however, are the uncontroverted facts that it was *he* who first approached Bracken with the investment idea, selected the property to be purchased, negotiated the purchase price of the property, selected the mortgage lender used to facilitate the acquisition, provided the false information concerning Bracken's income and assets, identified the subsequent buyer of the property, negotiated the sale price with the buyer, again selected a mortgage company that would facilitate the sale, directed Bracken to deposit the proceeds of the sale into her bank account, ordered Bracken to write checks to his mother and to "cash" from that account, and took physical possession of the checks made out to Ernestine Rogers and the money received from cashing other checks. Moreover, Bracken testified that she had no experience or knowledge about real-estate transactions and relied totally on Rogers's directions in those affairs. In light of overwhelming evidence that Rogers was the driving force in this scheme, the district court's application of the two-level enhancement for Rogers's role as an organizer, leader, manager, or supervisor in connection with the offenses. Consequently, by according the district court decision the deference it is due, we find no merit to this sentencing challenge.

## V.  Application of USSG § 2B1.1(b)(11)(A)(ii) Enhancement

The district court also enhanced Rogers's criminal offense level by two additional levels

for the possession or use of an authentication feature in the conspiracy to commit wire fraud.  *See*

USSG § 2B1.1(b)(11)(A)(ii).  Rogers objects to that increase in the offense-level computation on

the grounds that the trial evidence did not show that he or Bracken ever used or possessed an

authentication feature, or that any identification used by the person claiming to be Mark Fireman,

Jr., was a part of an offense for which Rogers was convicted.

Application Note 10(A) to § 2B1.1 of the Guidelines provides that the term

"authentication feature" should be given the same meaning that term has in 18 U.S.C.

§ 1028(d)(1).  Section 1028(d)(1), in turn, defines an "authentication feature as:

> any hologram, watermark, certification, symbol, code, image, sequence of
> numbers or letters, or other feature that either individually or in combination with
> another feature is used by the issuing authority on an identification document,
> document-making implement, or means of identification to determine if the
> document is counterfeit, altered, or otherwise falsified.

There is little doubt that the driver's license used by the person claiming to be Mark

Fireman was offered as identification in an attempt to verify that the buyer of the Woodlands

Estates property was indeed the person he claimed to be.  It is equally obvious that the driver's

license could serve its nefarious purpose only if it contained symbols, sequences of numbers or

letters, and other features used by the issuing authority to establish the license's authenticity.

Because the jury convicted Rogers of laundering the money received from the sale of the

property to "Fireman," it is clear that the jury determined that the sale was part and parcel of the

conspiracy to commit wire fraud.  An authentication feature thus was "used" in an offense for

which the defendant was convicted. The district court did not err in enhancing Rogers's sentence

another two levels under section 2B1.1(B)(11)(a)(ii) of the Guidelines.

## VI. Reasonableness of 78-Month Prison Sentence

Finally, Rogers challenges the propriety of his concurrent 78-month prison sentences.

We review a district court's imposition of a sentence for reasonableness. *See United States v.*

*Pearce*, 531 F.3d 374, 384 (6th Cir. 2008). Such a reasonableness review "has both a procedural

and a substantive component." *United States v. Erpenbeck*, 532 F.3d 423, 430 (6th Cir. 2008)

(citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Procedural errors include "failing to

calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory,

failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly

erroneous facts, or failing to adequately explain the chosen sentence – including an explanation

for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51. A review for substantive

reasonableness "will, of course, take into account the totality of the circumstances, including the

extent of any variance from the Guidelines range." *Id.* "[W]e may apply a rebuttable

presumption of reasonableness to sentences within the Guidelines," *Pearce*, 531 F.3d at 384, and

may not reverse a district court's sentencing determination simply because we "might reasonably

have concluded that a different sentence was appropriate." *Gall*, 552 U.S. at 51.

Rogers argues that the effective 78-month sentence is procedurally unreasonable because

the district court failed to explain adequately its rationale for selecting a punishment at the high

end of the applicable Guidelines range. Generally, we review the procedural reasonableness of a

sentence under a deferential abuse-of-discretion standard. *See Pearce*, 531 F.3d at 384.

However, if the district court, after pronouncing sentence, asks "the parties whether they have

any objections to the sentence just pronounced that have not previously been raised," and a party fails to articulate clearly any objection and the grounds therefor, "then that party will have forfeited its opportunity to make any objections not previously raised and thus will face plain error review on appeal." *United States v. Bostic*, 371 F.3d 865, 872-73 (6th Cir. 2004).

Here, the district court properly inquired of the parties, "Does either counsel have any objection to the sentence just imposed that they have not previously raised?" Because defense counsel responded, "No additional ones, no," our review of Rogers's challenge to the procedural reasonableness of his sentence is limited to plain-error review. Thus, to succeed on this claim, Rogers must show that:

> (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

*United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and citations omitted).

Without question, the district court's explanation of its reasons for its choice of sentence was not a model to be emulated in future proceedings. The district judge did little other than recite a number of the sentencing considerations listed in 18 U.S.C. § 3553(a). However, the district judge did explain that, twice before, Rogers's probated sentences had been revoked, indicating that Rogers failed to take seriously the obligations imposed upon him for his wrongdoing. Thus, we cannot conclude, on the record before us, that Rogers has satisfied his burden of demonstrating plain procedural error in the imposition of this sentence.

Nor has he shown that his 78-month, within-Guidelines-range sentence is substantively unreasonable upon convictions for money laundering and conspiracy to commit wire fraud that resulted in $669,500 in losses to the victims of the crimes. "[W]e may apply a rebuttable presumption of reasonableness to sentences within the Guidelines." *Pearce*, 531 F.3d at 384. Rogers has offered no argument on appeal that would rebut that presumption.

## CONCLUSION

For the reasons discussed, we find no reversible error in this matter. We thus AFFIRM the district court's judgment of conviction and the 78-month prison sentence imposed upon Rogers.