NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0208n.06

No. 16-5230

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Apr 07, 2017 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| DARRELL RANDOLPH, | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:    DAUGHTREY, MOORE, GIBBONS, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.   Facing the prospect of spending 300 months in prison, defendant Darrell Randolph appeals to this court seeking to overturn his convictions for multiple drug-trafficking and firearms offenses.  He argues that the district court erred in denying his motion for a directed verdict both on the charge of being a felon in possession of a firearm and on the charge of possessing a firearm in furtherance of a drug-trafficking offense.  He also asserts error in the refusal of the district court to grant his motion for a new trial based upon the improper inclusion of aliases in the indictment and the introduction into evidence of a confession that he alleges was obtained through coercive measures.  We find no reversible error and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On March 7, 2014, while assisting in an unrelated case that had resulted in defendant Randolph being incarcerated two days earlier, Detective Paul Vance of the Shelby County

Sheriff's Office accompanied other law enforcement officials as they executed a warrant authorizing a search for documents at 7108 Market Square Drive in Memphis, Tennessee. In the closet in the master bedroom of the residence, Vance found approximately four grams of heroin, leading him to seek and obtain a second warrant—this one to search the house for additional drugs and for drug paraphernalia. In the master bedroom of the house, that subsequent search yielded the following evidence: a loaded Ruger .41 caliber Magnum handgun that was hidden under the mattress of the bed; a digital scale and a shipping scale hidden under the bed; "a large amount of marijuana inside of the master bedroom closet in a black plastic bag"; heroin, crack cocaine, and powder cocaine in a vitamin bottle on the dresser in the master bedroom; and drugs and a small digital scale in the pocket of a jacket hanging inside the master bedroom closet. Additionally, authorities recovered, from a shelf in the garage and from two vehicles parked in the garage, a "[l]arge amount of crack cocaine and powder cocaine" and "a little heroin as well."

Subsequent analysis of the drugs by a forensic chemist with the Drug Enforcement Administration (DEA) indicated that 43 grams of heroin, 90.1 grams of marijuana, 518 grams of crack cocaine, and 767.2 grams of powder cocaine had been confiscated from the home. An investigator assigned to the DEA Task Force testified that those amounts of heroin, crack cocaine, and powder cocaine were consistent with possession of the narcotics with an intent to distribute. However, the 90.1 grams of marijuana—the equivalent of approximately 3.2 ounces of the substance—was an amount that could be considered consistent with personal use, not distribution.

Although neither of the two vehicles found in the garage was registered to Randolph or to his wife, Monique Polk, the owner of the 7108 Market Square property, Timothy Jackson, testified that he had leased the property to Polk in 2009. Moreover, Jackson explained, the lease

signed by the defendant's wife did not permit the tenant to sublet the property, that Randolph himself was present at the signing of the lease, that Randolph usually paid the rent on the home in person, either at the house or at an agreed-upon location, and that Jackson never saw any adults at the house other than Randolph and Polk. Even though some evidence was adduced that the defendant and his wife spent much of their time at another residence on Coral Creek Lane in Memphis, other testimony indicated that they "were going back and forth" to the house on Market Square Drive. In fact, in the Market Square home, officers found one of Randolph's 2009 tax documents, a 2011 credit-card application in Randolph's name, a 2012 insurance receipt with the defendant's name on it, a 2011 bank statement bearing the defendant's name, a utility bill in Polk's name, an invitation from their wedding, and various items of clothing. Randolph's stepdaughter also mentioned to a sergeant in the Sheriff's Office that the family "had a washer and dryer at [the Market Square home] and they went back and forth to wash clothes, that [her] mom sometimes worked out of that residence and often went back and forth over there."

At some point on the day of the search, Monique Polk arrived at the house on Market Square Drive and was taken to the offices of the Narcotics Division for questioning. Then, "[b]ased off of the information [Vance] gained from the interview of Ms. Polk, [he] decided to go down to . . . the County Jail, and speak with Mr. Randolph."

Upon meeting Randolph at the jail, Vance explained that he did not intend to question him regarding the alleged offense for which he already had been incarcerated. Instead, Vance told the defendant that his visit had "everything to do with what we found at 7108 Market Square Drive." He first detailed for Randolph "everything that was found" at the house. Then, as Vance later testified, he explained to the defendant that he would have to arrest Randolph's wife for the

drug trafficking if someone else did not claim ownership of the contraband found there, given that Randolph and Polk were the only residents. In response, "Randolph said that he believed that the narcotics that [were] found at his residence [were] garbage and that he meant to throw them away."

Only at that point did Vance and another sheriff's officer advise Randolph of his *Miranda* rights. The defendant waived those protections and agreed to speak to the authorities without a lawyer present. During the ensuing interrogation, Randolph "claimed [ownership] of everything in the house" and did so "several times." Moreover, during his statement, Randolph twice denied that the drugs belonged to his wife and further claimed that they did not belong "to any other individual other than himself."

Based upon those statements and the physical evidence recovered from the Market Square residence, Randolph was charged with drug and firearms offenses. A federal grand jury subsequently returned a six-count indictment that charged Randolph with: possession with intent to distribute 280 grams or more of cocaine base (Count 1); possession with intent to distribute at least 500 grams of cocaine (Count 2); possession with intent to distribute heroin (Count 3); possession with intent to distribute marijuana (Count 4); being a felon in possession of a firearm (Count 5); and possessing a firearm in furtherance of a drug-trafficking crime (Count 6).

At trial, Vance testified about the search of the Market Square residence, the evidence recovered during the search, and the statements later made by Randolph. Trial testimony from other witnesses included: information about the lease and occupancy of the home; results of the laboratory testing of the substances recovered during the search; the manufacturing site of the recovered Ruger firearm; the fact that no usable fingerprints were found on the gun; proof of Randolph's prior felony conviction years before for possession with intent to distribute

marijuana; and testimony that the amounts of heroin, cocaine, and cocaine base recovered were consistent with distribution and drug trafficking.

At the close of the prosecution's case, Randolph conceded that sufficient evidence had been adduced on the drug charges to allow those counts of the indictment to be submitted to the jury. But, he moved for a directed verdict of acquittal on Counts 5 and 6 of the charging instrument, arguing that the government had failed to establish both his connection with the Ruger and the Ruger's connection with any drug-trafficking activity. The district court denied the motion, and after the defendant chose not to call any witnesses, delivered instructions and submitted the case to the jury, which returned guilty verdicts on Counts 1, 2, 3, 5, and 6, but acquitted Randolph on Count 4 of the indictment that charged possession of marijuana with the intent to distribute. The district court subsequently denied Randolph's motion for a new trial.

The district court sentenced the defendant to concurrent 240-month sentences for the three drug offenses on which the jury had returned guilty verdicts. The district court also imposed a concurrent 120-month sentence for the felon-in-possession conviction and ordered that Randolph serve a mandatory, consecutive, 60-month sentence for possessing the Ruger in furtherance of a drug-trafficking crime. Thus, the district court imposed an effective sentence of 300 months in prison and ordered that Randolph be subject to supervision for an additional ten years after his release from incarceration.

## DISCUSSION

### Denial of Motion for Directed Verdict of Acquittal

#### Standard of Review

At the close of the government's case, Randolph moved, pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, for a directed verdict of acquittal on the charges of being a

felon in possession of a firearm and possessing a firearm in furtherance of a drug-trafficking offense. The district court denied the motion, a denial that we review *de novo*. *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014). "'[T]he relevant question' for us on appeal is whether '*any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Consequently, "[a] criminal defendant faces a 'very heavy burden' in attempting to overturn the denial of a Rule 29 motion." *Id.* (citing *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)). Of course, when engaged in such a review, "[w]e do not insert our own findings of fact; rather we give full credit to the responsibility of the jury to weigh the evidence, to make credibility determinations, and to draw inferences." *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (citing *Jackson*, 443 U.S. at 319).

### Count 5: Felon in Possession of a Firearm

Pursuant to the provisions of 18 U.S.C. § 922(g)(1), it is unlawful for any individual who previously has been convicted of a crime punishable by imprisonment exceeding one year to possess any firearm or ammunition that was shipped or transported in interstate commerce. In this case, Randolph admitted that he owned the gun found under the mattress in the master bedroom of the home at 7108 Market Square Drive, and trial testimony established both that he had been convicted of a felony drug offense in 1997 and that the firearm found in the house had been manufactured in Newport, New Hampshire, and transported in interstate commerce. Hence, at first blush it appears that the government clearly proved the defendant's guilt of the felon-in-possession charge. Randolph argues, however, that his *ownership* of the firearm does not necessarily establish his *possession* of that weapon for purposes of § 922(g)(1). Rather, he contends, the government must establish that he intended to exercise dominion and control over

the object. Because it was Randolph's wife who leased the property where the gun was found, because all documentary evidence of Randolph's connection with the house was from prior years, because the cars in the garage of the house were not registered to the defendant, because the placement of the gun under a mattress meant that the weapon was not easily accessible, and because Randolph was incarcerated at the time of the search, he submits that his *possession* of the Ruger was not established beyond a reasonable doubt.

A conviction under § 922(g)(1) may be based on either actual or constructive possession of a firearm. "[C]onstructive possession exists when the defendant does not have possession but instead knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008) (citations and internal quotation marks omitted). A rational trier of fact could find in this case that Randolph indeed had constructive possession of the gun found in the Market Square residence. Although it is true that only Polk's name appeared on the lease for the property and that the couple also spent time at another house, the evidence was uncontroverted that Randolph alone owned the gun, that Randolph still maintained a presence at and an interest in the Market Square address, and that he himself usually paid the rent for the house. Furthermore, even though Randolph was incarcerated at the time the house was searched and the gun was found, the jury rationally could have concluded that the defendant intended to exercise dominion and control over the firearm at a later time.[1]

---

[1] In accordance with the Sixth Circuit Pattern Jury Instructions, the district court charged the jury as follows:

> To establish constructive possession, the government must prove that the defendant had the right to exercise physical control over the firearm, and knew he had this right, and that he intended to exercise physical control of the firearm at some time, either directly or through other persons.

> For example, if you left something with a friend intending to come back later and pick it up, or intending to send someone else to pick it up for you, you would have constructive possession of it while it was in the actual possession of your friend.

**Count 6: Possession of a Firearm in Furtherance of a Drug-Trafficking Offense**

By its terms, 18 U.S.C. § 924(c) "criminalizes two separate and distinct offenses": (1) using or carrying a firearm "during and in relation to" a drug-trafficking offense, and (2) possessing a firearm "in furtherance of" a drug-trafficking offense. *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004). In order to obtain a conviction under § 924(c) for possession of a firearm *in furtherance of* a drug-trafficking offense, the government must "prove a defendant used the firearm with greater participation in the commission of the crime or that the firearm's presence in the vicinity of the crime was something more than mere chance or coincidence." *Id.* In other words, there must be "a specific nexus between the gun and the crime charged." *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001). More specifically:

> In order for the possession to be in furtherance of a drug crime, the firearm must be strategically located so that it is quickly and easily available for use. Other factors that may be relevant to a determination of whether the weapon was possessed in furtherance of the crime include whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found. The list of factors is not exclusive, but it helps to distinguish possession in furtherance of a crime from innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard.

*Id.* (citations omitted).

Here, the Ruger was "strategically located so that it [was] quickly and easily available for use," being hidden in the same room where some of the drugs were found. Additionally, the gun was neither an antique nor a hunting weapon, but rather was loaded and ready for use. Because Randolph was a convicted felon, his very possession of the Ruger was illegal, and the large quantity of drugs found in the home suggested "that the purpose of the firearm was to provide defense or deterrence in furtherance of the drug trafficking for which defendant was arrested." *Id.* at 462-63; *see also United States v. Barnes*, 822 F.3d 914, 920 (6th Cir. 2016). In light of

these facts, a rational trier of fact could conclude beyond a reasonable doubt that Randolph possessed the Ruger in furtherance of a drug crime. The district court thus did not err in denying the motion for a directed verdict on this ground.

**Denial of Motion for a New Trial**

### Standard of Review

Randolph next alleges error in the district court's denial of his motion for a new trial. Specifically, he disputes the district court rulings that found no reversible error in the allegedly improper listing of aliases in the indictment and in the alleged coercion used to extract a confession of ownership of the drugs and gun. Our review of a district court's denial of a motion for a new trial is somewhat limited, and we will reverse a district court's ruling only for an abuse of discretion. *United States v. Arny*, 831 F.3d 725, 730 (6th Cir. 2016). "The district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *United States v. White*, 492 F.3d 380, 408 (6th Cir. 2007).

### Use of Aliases in the Indictment

Each of the six counts of the indictment returned against Randolph alleged that he, "a/k/a 'Big C,' a/k/a/ 'Big Church,' a/k/a 'Big Churp,' a/k/a 'Big,'" committed a federal offense. Moreover, during *voir dire*, the district court read to the prospective jurors each word of the indictment, including the repetition of Randolph's four aliases. Although Randolph's counsel did not object to the references to the aliases at the time, the defendant now argues that informing the jury of the existence of aliases unduly prejudiced him. Indeed, for the past 45 years, we strongly have "disapprove[d] the practice of including aliases in indictments." *United States v. Wilkerson*, 456 F.2d 57, 59 (6th Cir. 1972). "It is clear, however, that the use of an alias in an

indictment and in evidence is permissible if it is necessary to connect the defendant[ ] with the acts charged." *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001) (quoting *United States v. Hines*, 955 F.2d 1449, 1454 (11th Cir. 1992)).

Even though one potential juror properly was dismissed from the venire because she previously had heard of drug activities by a person with Randolph's aliases,[2] we cannot condone the government's listing of those aliases in the indictment. Any error in this regard, however, is not cause for reversal of the defendant's convictions. The district court, in denying Randolph's motion for a new trial, noted that "the Government explained that Defendant was also indicted in a related federal case where the witnesses would identify Defendant by his aliases, and the Government anticipated trying both cases together. Therefore, it was necessary to include Defendant's aliases to connect the anticipated witness' testimony to Defendant." The fact that the cases ultimately were not tried together should have led the government to redact the aliases from the charging instrument. Nevertheless, any error in this regard could not have affected the verdict, given the strength of the evidence against Randolph. The defendant himself claimed ownership of the illegal drugs and of the weapon found in the Market Square home. Combined with other testimony offered at trial, that admission was sufficient to point the finger of guilt unerringly at Randolph. The district court, therefore, did not abuse its discretion in denying the claim in the motion for new trial that Randolph was prejudiced unduly by the inclusion of aliases in the indictment.

**Introduction of Randolph's Confession**

Randolph also insists that he should have been granted a new trial because law enforcement officers coerced him into confessing that he owned the illegal drugs and the gun

---

[2] During questioning by the court, one prospective juror stated, "I have heard about Big C. . . . I just heard that he was slanging and stuff. . . . Yes, Big Church. . . . Several of those names, I have heard them being mentioned."

found at the residence.  The government responds that the defendant waived this challenge by not seeking to suppress the statement prior to the start of the trial.  *See* Fed. R. Crim. P. 12(b)(3)(C) (request to suppress evidence "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits").  We have reviewed the motion to suppress and the magistrate judge's report summarizing the testimony at the suppression hearing, from which we conclude that Randolph did not raise this issue either directly or indirectly prior to trial.  In addition, there was no objection to admission of the confession at trial and no challenge to it in the motion for judgment for acquittal.  The only issue about the confession included in the motion for a new trial was an argument that the testimony of the officers who witnessed the confession did not reflect what actually occurred.  Because the admissibility of the confession was raised for the first time on appeal, we decline to consider it.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.