NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0123n.06

No. 23-3077

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Mar 15, 2024 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) |  |
|  | ) | ON APPEAL FROM THE |
| BLESSING ADELEKE aka Blessing Raymond | ) | UNITED STATES DISTRICT |
| aka Puri Johannes, | ) | COURT FOR THE NORTHERN |
|  | ) | DISTRICT OF OHIO |
| Defendant-Appellant. | ) |  |
|  | ) | OPINION |
|  | ) |  |

Before: GRIFFIN, THAPAR, and NALBANDIAN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Blessing Adeleke engaged in a multitude of identity-theft schemes. A jury convicted him of sixteen counts of bank fraud and one count of conspiracy to commit bank fraud. He appeals his convictions, arguing that the district court improperly allowed an FBI agent to testify as an expert witness and that there was insufficient evidence to convict him. We affirm.

I.

Adeleke's criminal activity occurred under online usernames "DetecteD" and "DetectedBits" (collectively "DetecteD"). While using the DetecteD alias, and with the help of codefendant Kylie Harlow and her friend Carley Reading, Adeleke orchestrated several schemes that utilized stolen personally identifiable information to purchase and resell consumer products and engage in check fraud. Relevant to this appeal is an instance concerning how they cashed checks written against an unknowing victim's account—Adeleke mailed four fraudulently gained

checks (two each to Harlow and Reading) with instructions for them to cash the checks and send him some or all of the proceeds. The check scheme was only partially successful because some checks bounced. All told, Harlow and Reading worked with Adeleke (whom they knew only as DetecteD) for about six months.

Law enforcement connected Adeleke to the DetecteD alias through a series of online accounts. The first account law enforcement discovered was a Facebook profile that communicated with Reading and Harlow. The account frequently trafficked in personally identifiable information, and law enforcement discovered through Facebook's records that the account was linked to a Gmail account: detectedbits@gmail.com. That Gmail account also trafficked in personally identifiable information and was associated with two other email accounts bearing Adeleke's name: blessingadeleke@gmail.com and blessing_adeleke@ymail.com. In turn, the Ymail account connected to a different Facebook account for "Raymond Blessing." That Facebook account provided the link to Adeleke—it discussed Adeleke's travel information (and defense counsel conceded at trial that it was his account).[1]

A grand jury indicted Adeleke for one count of conspiracy to commit bank fraud, 18 U.S.C. § 1349, and sixteen counts of bank fraud, 18 U.S.C. § 1344. The sixteen bank-fraud counts were all based on attempted transfers from a single KeyBank checking account on the same day and for similar amounts of money. Four of those transfers were the checks to Harlow and Reading. A jury convicted Adeleke on all counts, and the district court sentenced him to 37 months' imprisonment and five years of supervised release. This appeal followed.

---

[1]Other ties between these accounts further linked Adeleke and DetecteD. The same SMS number—a number that receives messages—was used for the Gmail account and the Raymond Blessing Facebook account. And both Facebook accounts used the same IP address within three minutes of each other, establishing that they were accessed from the same location or device.

II.

Adeleke's first issue on appeal concerns FBI Agent Monica Hantz's testimony. He argues that the district court did not follow the proper procedures before allowing her to testify as an expert, and he contends that she was not qualified to provide expert testimony about the business practices of Google, Yahoo, and Facebook. We will reverse only if the district court abused its discretion by admitting Hantz's testimony and the error was not harmless. *United States v. Jaffal*, 79 F.4th 582, 602 (6th Cir. 2023).

A.

We begin with the procedural argument. Adeleke filed a motion in limine before trial to prevent Hantz from testifying as an expert witness under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The morning that trial began, the district court told the parties it would not rule on that motion until Hantz started to testify, but that it was "inclined" to deny Adeleke's motion. Even so, the district court stated that, "[i]f requested," it would hold "a *Daubert* hearing immediately before [Hantz's] testimony." When Hantz testified, defense counsel "renew[ed his] objection in limine" without elaboration or a request for a *Daubert* hearing. Without explicitly ruling on the objection, the district court allowed Hantz's testimony to continue and gave a limiting instruction to the jury, explaining how the jury should weigh fact and opinion testimony and that the jury did not "have to accept the opinion evidence."

Adeleke argues that this procedure was improper under *United States v. Johnson*, 488 F.3d 690, 697–98 (6th Cir. 2007). There, we cautioned that judges should not "declare" before the jury that a witness is an expert because doing so could improperly sway the jury's perception of the witness. *Id.* We explained that the district court should instead allow "the proponent of the witness" to "pose qualifying and foundational questions and proceed to elicit opinion testimony,"

-3-

and, if the opponent objects, allow for voir dire questioning "if necessary and requested" and then rule on the objection. *Id.* at 698. But given the circumstances here, *Johnson* does not require reversal.

To begin, the district court never referred to Hantz as an expert witness before the jury. Indeed, defense counsel was the only party to refer to Hantz having any "expertise." Furthermore, both parties had the opportunity to explore Hantz's qualifications. In addition to probing her qualifications through defendant's pretrial motion and the government's response, at trial, the prosecutor asked Hantz about her education and work history and defense counsel had the opportunity to cross-examine her about those qualifications. And most importantly, defense counsel never asked for a *Daubert* hearing despite the district court offering to hold the hearing if requested when Hantz testified. So, under *Johnson*, the district court was not required to give defense counsel an opportunity to ask Hantz voir dire questions. *Id.* at 697–98.

B.

Adeleke next argues that Hantz was not qualified to provide expert testimony because she never worked for Google, Facebook, or Yahoo, had insufficient experience relating to those companies, and therefore could not demonstrate she knew how they kept their records or that she knew their business practices. Federal Rule of Evidence 702 governs the admission of expert testimony. We have long held that "[l]aw enforcement officers may testify concerning the methods and techniques employed in an area of criminal activity" because "[k]nowledge of such activity is generally beyond the understanding of the average layman." *United States v. Pearce*, 912 F.2d 159, 163 (6th Cir. 1990) (internal quotation marks omitted). "Our court regularly allows" such testimony from "qualified law enforcement personnel" if "appropriate cautionary instructions are given." *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004) (citation omitted); *see*

*also, e.g.*, *Dunnican*, 961 F.3d at 875–76 (explaining that courts "overwhelmingly" allow police officers to testify as experts in areas "not within the experience of the average juror" like "drug dealing") (citation omitted).

Hantz was qualified to give expert testimony in this case. She explained that she holds an undergraduate degree in computer science, worked as a computer programmer for about four years before becoming an FBI agent, had been an FBI agent for ten years, and focused her investigations on "computer intrusion" and "cyber criminal activities." These credentials provided Hantz with ample experience to testify in general about topics such as Adeleke's criminal schemes and the connections between Adeleke's various accounts.

As for Adeleke's argument regarding Hantz's lack of specific qualifications concerning Google, Yahoo, or Facebook, Hantz's testimony did not require such specific expertise. Though she testified about records from those companies, her testimony was limited to those records' significance to her investigation and how they showed connections between the accounts. Adeleke's counsel had "[n]o objection" to the admission of the records themselves, and no special expertise—beyond Hantz's extensive cyber-crime-investigation credentials and experience—was needed to testify about the various connections between the Facebook, Google, and Yahoo accounts. Hantz did not opine about the technical details of how these companies stored specific recovery email addresses, SMS numbers, or other profile information; rather, she explained the connections she drew based on the records' data.

What is more, the closest Hantz came to testifying about her knowledge of the companies' business practices was in response to a question *by defense counsel* about her knowledge of how Google and Yahoo "work." Hantz did not claim to have intimate knowledge of those companies' business practices, admitting that she possessed merely "general" knowledge. Defense counsel

then asked a series of questions about Google, Yahoo, and Facebook. To the extent Adeleke takes issue with Hantz's revelation of her "general" knowledge of these companies in response to defense counsel's cross-examination questions, any error on that basis was invited by defense counsel. *See, e.g.*, *United States v. Ramer*, 883 F.3d 659, 677 (6th Cir. 2018) (holding that a challenged statement elicited on cross-examination was invited error).

For these reasons, we discern no evidentiary error concerning Hantz's testimony meriting reversal.

III.

Adeleke's second issue on appeal concerns the sufficiency of the evidence supporting his convictions. "We review *de novo* the sufficiency of the evidence to sustain a conviction." *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021) (internal quotation marks omitted). We ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (citation omitted).

Ample evidence connects Adeleke to DetecteD. Defense counsel conceded at trial that the Raymond Blessing Facebook account belonged to defendant, and the travel records discussed on that account confirm that connection. And information from that account further demonstrated Adeleke was DetecteD—it shared an SMS number with detectedbits@gmail.com, used the blessing_adeleke@ymail.com email address, and connected to Facebook within three minutes of the DetecteD Facebook account using the same IP address. Given these connections, a rational juror could certainly conclude that Adeleke was DetecteD.

Further, a rational juror could conclude that Adeleke committed bank fraud. A conviction for bank fraud requires the government to prove three elements beyond a reasonable doubt:

"(1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC." *United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001); 18 U.S.C. § 1344. And a conviction for conspiracy to commit bank fraud requires proof beyond a reasonable doubt that "two or more persons conspired, or agreed, to commit the crime of [bank fraud] and that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Rogers*, 769 F.3d 372, 377, 379–82 (6th Cir. 2014) (internal quotation marks omitted); 18 U.S.C. § 1349. Each requirement is easily met here. Adeleke stipulated that KeyBank was a federally insured financial institution. Regarding his conduct, Adeleke sent four checks to Reading and Harlow that sought to draw money from an account none of them owned. The account owner neither authorized those transactions, nor the twelve others that were attempted the same day for similar amounts of money. Those twelve transactions were strikingly like the four checks Adeleke sent to Reading and Harlow, so a reasonable juror could conclude that Adeleke initiated the remaining twelve transactions as well. Thus, sufficient evidence supports Adeleke's convictions for bank fraud. And because the essence of Adeleke's scheme required him to enter into an agreement with others to commit fraud, the government also presented sufficient evidence to convict Adeleke of conspiracy to commit bank fraud.

## IV.

For these reasons, we affirm the district court's judgment.