UNITED STATES of America,
Plaintiff–Appellee,

v.

Kelvin GARRARD and Bryant Reagor,
Defendants–Appellants.

Nos. 95–3389, 95–3391.

United States Court of Appeals,
Seventh Circuit.

Argued March 25, 1996.

Decided May 10, 1996.

Patricia A. Tomaw, argued, Office of U.S. Atty., Springfield, IL, for plaintiff-appellee.

Kelvin Garrard, Chicago, IL, pro se.

Mark Appleton, argued, Appleton & McHugh, Aledo, IL, Greg Chickris, East Moline, IL, for defendant-appellant.

Before BAUER, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

One of the results—whether it is an unfortunate result or not depends on one's point of view—of the federal sentencing guidelines is longer sentencing proceedings. Under the old law, sentencing proceedings were fairly brisk affairs. Witnesses were called to testify only in unusual cases. And even at that, most witnesses at sentencing were character-type folks—an employer, a minister, a spouse, or a mother—who usually extolled the virtues of the defendant. For the government, the rare witness might be a police officer or an agent who testified that a defendant cooperated or, on the other hand, was a dreadful character who should be sentenced more harshly than one would think.

Under the regime established by the guidelines, sentencing proceedings are often elongated. Sometimes they drag on for days. And lengthy sentencing proceedings often occur in cases where defendants have pled guilty. This situation presents itself because the government and the defendant do not see eye-to-eye on the application of the guidelines. When this occurs, witnesses are often called on both sides to hash out issues like a defendant's role in the offense (was he a leader or a manager, or a minimal or minor participant?) or his relevant conduct (does 20 kilos or 20 ounces of cocaine reflect the extent of the drug trafficking?). When witnesses, desired by one side or the other at a sentencing hearing, are in custody, problems occur. Such is our case today.

Bryant Reagor, Brian Hamilton, McKinley Womack, and Kelvin Garrard were charged in an indictment alleging crack cocaine trafficking in Rock Island and Moline, Illinois. Count 1 alleged that the defendants conspired with Alan Woods and Kevin Burns to distribute crack from late 1991 until the early spring of 1994. Reagor pled guilty to the charge. The presentence report pegged his offense level, based on accountability for over a kilo and a half of crack, at 38. No adjustments, either up or down, were made for Reagor's role in the offense, and he received a goose egg for acceptance of responsibility. With a criminal history category of IV, his guideline range was a staggering 324 to 405 months. Like getting ice in the wintertime, Reagor was sentenced at the low end of the range—27 years without parole.

Reagor's primary argument on appeal is that the district court improperly denied his request to produce Woods, the leader of the drug trafficking conspiracy, so he could "explain" Reagor's limited role in the criminal activity. At the time of the sentencing, Woods was in federal custody following his conviction and sentencing for drug activities in California. Because Woods was not present, Reagor says, the district court did not hear the kind of testimony that would have moved the judge to find (1) that Reagor was either a minor or minimal participant in the

conspiracy, (2) that he did in fact accept responsibility for his actions, and (3) that the quantity of crack attributed to him was too high.

To put these claims in perspective, it is necessary to delve into the facts, which started to emerge in late 1991. Most of these facts, which the trial court had every reason to believe, come from testimony at the sentencing hearing.

Everyone agrees that Alan Woods operated a drug distribution business in Bakersfield, California, and that in late 1991 he decided to expand his California business into the Quad Cities area encompassing Rock Island and Moline, Illinois. Woods, who always lived in Bakersfield, sent "crews" to the Quad Cities to oversee his drug operation. The drugs (regular and crack cocaine) were transported to the Quad Cities by women couriers who generally traveled by bus from Bakersfield to Davenport, Iowa. Money from the sale of drugs was returned to Woods by the couriers or by crew members when they went back to California. Occasionally, drugs and money were sent by UPS.

Sheldon Price and Frank Wright, the first "crew," arrived in the Quad Cities area in late 1991. Nate Jones, a local resident who agreed to work with Woods, introduced them to customers. Jones also stored cocaine at his residence. Price and Wright operated the Quad Cities branch of the Woods drug organization until March 28, 1992, when they were involved in a shooting incident at a local bar.

In April of 1992, Dewayne Crompton and Reagor, who was known as "Fats," arrived as the second crew (the first crew, it seems, was being replaced) to oversee the Woods operation. They lived at an apartment in East Moline, leased for their use by Tony Barnes. Crompton and Reagor stored cocaine at the apartment. They also rented a house from which they distributed their drugs. Reagor started selling crack to Barnes about a week or two after his arrival in the area. Barnes initially purchased ½–ounce quantities almost daily for about two weeks, which increased to 1½–ounce quantities every two days, and then again increased to 3–ounce quantities. Barnes continued to purchase his cocaine

from Reagor for about two and one-half months, at which time Barnes switched to Crompton as his supplier since Crompton agreed to sell at a cheaper price.

Jones testified that he knew of three shipments of cocaine sent to Reagor and Crompton in the Quad Cities. Julie Scott brought two shipments and Sonya Haynes brought one.

Reagor and Crompton continued to oversee Woods' drug operation in the Quad Cities until sometime that summer (1992) when part of a shipment was stolen from their car. Nate Jones, it seems, double-crossed his associates by orchestrating the theft of at least two kilograms of cocaine that Crompton and Reagor stored in the trunk of their car. Crompton and Reagor contacted Woods to tell him about the theft, and Woods ordered both back to California. Although some weeks later Reagor and Crompton returned to the Quad Cities, they were unable to resume their drug business, and so they left.

That fall, Barnes learned from Woods that Crompton was still working for him, this time in Hammond, Indiana. Barnes made three trips to Hammond to buy drugs from Crompton, getting 20 ounces on each trip. The last trip occurred the day before Crompton was arrested in Wisconsin while transporting drugs from Indiana to Minnesota. On this last trip to Hammond, Crompton told Barnes that Reagor was in Minneapolis and would be coming through the Quad Cities on his way to Hammond and could deliver some crack and pick-up money Barnes owed for drugs he purchased from Crompton. After Crompton's arrest, Barnes contacted Woods. Woods gave Barnes a number in Minnesota where Barnes could contact Reagor. Barnes then contacted Reagor to make arrangements for a delivery, and a few days later Reagor delivered 17 ounces of crack to Barnes in Rock Island.

The Woods operation was successful until Jones let the cat out of the bag in late 1993. With information from Jones, the police intercepted two shipments of drug money being sent to Woods in California (each about $20,000), and on February 10, 1994, authorities intercepted 1½ kilograms of crack cocaine

Woods shipped from Bakersfield to the Quad Cities. On April 1, 1994, search warrants were issued for houses in the Quad Cities area identified as stash houses for Woods' cocaine. Two and one-half more kilograms of crack were seized. As a result of this activity, the Woods drug organization, in the Quad Cities area, went kaput.

Reagor filed a motion asking the district court to issue a writ of habeas corpus ad testificandum to produce Woods as a witness at Reagor's sentencing hearing. The government objected to the writ on the grounds that Reagor had failed to show that Woods was a necessary witness as required by Rule 17(b) of the Federal Rules of Criminal Procedure. The district court, finding that Woods was not a necessary witness, denied the writ. Woods, it should be noted, had previously pled guilty to conspiracy to distribute crack in federal court in California. Following his plea, he cooperated with the government and "proffered" information about his organization. Copies of reports of the proffers were given to Reagor prior to sentencing.

At Reagor's sentencing, the government called three witnesses, including Jones and Barnes, who testified in detail about drug transactions they had with Reagor while Reagor and Crompton were working for Woods in the Quad Cities. FBI Special Agent Mike Spencer also testified regarding the investigation which led to Reagor's arrest. In the face of this testimony, Reagor took an unusual stance; he said he was not involved in any way in the distribution of cocaine, that he just came to the Quad Cities to be with his pal Woods, and that he only pled guilty and said he acted as a lookout so he could get points off his guideline score for acceptance of responsibility. The district judge thought Reagor's claim that he did not do anything was incredible, and accordingly found that he had not accepted responsibility. This led to a denial of points (up to 3) under U.S.S.G. § 3E1.1.

Reagor further objected to being held accountable for distributing 108 ounces (3.1 kilograms of cocaine base) as set forth in the presentence report. The district judge found Reagor responsible for distributing 98 ounces (2.68 kilograms) of crack. In making his finding, the judge used the lower drug quantity estimate and frequency of purchases from Reagor testified to by Barnes (½ ounce every two days for two weeks, then 1 ounce every three days for two weeks, and then 3 ounces every three days for a month), together with the testimony of Jones (10–15 ounces a shipment), for a total of 41 ounces of crack. In addition, the court found Reagor accountable for 40 ounces of crack cocaine that had been stolen out of the trunk of the car and the 17 ounces Reagor delivered to Barnes at the end of October 1992 following Crompton's arrest.

Reagor also objected to the finding in the PSR that he was not a minimal or minor participant in the conspiracy. The government took the position that Reagor played an extensive role in the distribution of a substantial quantity of crack and that his role, therefore, was far from minimal or minor. Barnes and Jones testified about repeated drug transactions with Reagor, that Reagor and Crompton stored the drugs Woods sent, and that Reagor and Crompton set their own price for the drugs they sold. The judge found Reagor's role was more than a "mule" as explained in the application notes to U.S.S.G. § 3B1.2 and thus not minimal. The district judge further found that the evidence showed Reagor was one of the principal persons in charge of the Woods organization in the Quad Cities, and thus his role was more than minor.

All of this would have been different, Reagor tells us, if Woods had been produced as a witness as requested. If Woods had testified, Reagor would have been found responsible for only 40 to 45 ounces of crack and the judge would have seen that his statements of a limited role as a "lookout" and traveling companion were true. Had the judge bought into these claims, Reagor says he would have received mitigating role points as a minor or minimal participant and been rewarded for acceptance of responsibility.

The sentencing hearing in this case was spread over three days, which is not unusual today in drug conspiracy cases. Reagor's request to have Woods produced was made before the hearing started, and it was renewed after Jones and Barnes testified.

Judge McDade denied the request, and we must decide if that denial was appropriate.

A writ of habeas corpus ad testificandum differs from a simple witness subpoena under Rule 17(b) of the Federal Rules of Criminal Procedure. A subpoena orders the individual whose testimony is sought to attend the court proceeding. A writ of habeas corpus ad testificandum, on the other hand, is directed to the custodian of the potential witness. The custodian, to comply with the writ, must transport the witness to the courthouse. The writ, therefore, is more complicated than a subpoena, and compliance with it can be cumbersome and, in some cases, expensive and time-consuming.

Under 28 U.S.C.A. § 2241(c)(5), a judge may, in his or her discretion, issue a writ of habeas corpus ad testificandum to secure the appearance of a state or federal prisoner as a witness in federal court. In addition to § 2241(c)(5), when a defendant in a criminal case requests the issuance of a writ of habeas corpus ad testificandum, constitutional considerations and the procedural considerations of Rule 17(b) apply.

Most of the law concerning standards to be applied when defendants in criminal cases request the issuance of a writ of habeas corpus ad testificandum is found in the context of a trial, when guilt or innocence is on the line. And we know the rules, constitutional and otherwise, apply differently in trial and sentencing contexts. For example, hearsay is inadmissible during a trial but clearly admissible, over claims of violations of confrontation rights, in sentencing proceedings. *United States v. Badger,* 983 F.2d 1443 (7th Cir.), *cert. denied,* 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993). But today, in the context of the federal sentencing guidelines, the real game is often the sentencing proceeding, not the trial. This case is a good example. Reagor pled guilty, and all of the real action occurred at sentencing. And if Reagor's positions at sentencing had been sustained, his penalty would have been reduced by 63 percent. This is so because, had the district court believed his view of the case, Reagor would have lost four points for a mitigating role in the offense, three points for acceptance of responsibility and two points for relevant conduct. The deductions, at criminal history level IV, would have moved him from level 38 (a range of 324–405 months) to level 29 (a range of 121–151 months). Had Reagor been sentenced at the low end of that range, he would have caught a term of 10 years and a month, a shaving of 16 years and 11 months off the term he actually got.

■ We think that a district judge, in exercising discretion when ruling on a request for a writ of habeas corpus ad testificandum at sentencing, should take into account the effect the proffered testimony may have on the application of the guidelines. The judge should also consider the time, expenses, delay, and resources that would have to be expended to produce the witness. If, for example, a witness is in custody thousands of miles from the courthouse, and the proffered testimony, if accepted, would move the defendant from, say, level 20 (33–41 months) to level 17 (24–30 months), a very strong showing of relevancy and necessity should be made by a defendant before the writ is issued. Furthermore, it would not be inappropriate to request, in such a situation, that other alternatives—a stipulation, an affidavit, testimony over the telephone, etc.—be explored prior to requesting the writ. On the other hand, when the proposed witness, if believed, could produce the sort of drastic reduction in range that Reagor could get, hypothetically at least, the showing of relevancy and necessity should be greatly reduced.

■ While we find this to be a close case, we nevertheless defer to the discretion of the experienced district judge who concluded that Woods' testimony would have made no difference in determining Reagor's range under the guidelines. Woods was not present in the Quad Cities areas when the events described by Barnes and Jones took place. Although there is a faint chance that Woods might have said that Jones and Barnes were liars, that possibility, on this record, is more than extremely remote. Furthermore, the defense here made, as we view the record, only a halfhearted effort to secure Woods' appearance. The defense never said, other than in generalities, what Woods would say

once he arrived in court in Rock Island. It's altogether likely that when he arrived in court he would have testified consistent with his proffer to the FBI, which was made available to Reagor, and which did not help Reagor's cause.

A defendant in a criminal case is entitled to be sentenced on the basis of reliable information. *United States v. Francis,* 39 F.3d 803 (7th Cir.1994). We are comfortable, based on our review of the record, that the district judge based the sentence on reliable information and that Woods' absence did not infringe on Reagor's rights.

Furthermore, independent of Woods' appearance, the amount of drug trafficking attributable to Reagor, the fact that he played anything but a minor or minimal role in the conspiracy, and that he almost went out of his way to deny significant involvement in the illegal activity at his sentencing proceeding supports the district judge's finding as to relevant conduct, role in the offense, and acceptance of responsibility.

Lastly, we noted earlier that one of Reagor's codefendants was Kelvin Garrard. Garrard pled guilty to a count charging possessing crack cocaine with intent to distribute. He received a 210–month sentence. Garrard has also filed a notice of appeal, but his attorney filed a motion to withdraw as counsel, accompanied by a very comprehensive brief pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), contending that the appeal was legally without merit. As is our practice, see Circuit Rule 51(a), Garrard received a copy of the *Anders* brief, and he has not filed a response. We have examined the record and find no nonfrivolous issues which Garrard could conceivably rely on for relief.

For these reasons, Garrard's counsel is relieved of further responsibility in this case and the Garrard appeal is DISMISSED. We AFFIRM the judgment of the district court on Reagor's appeal.