NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0097n.06

No. 15-4425

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="12"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Plaintiff-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>GEZIM SELGJEKAJ,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Defendant-Appellant.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

FILED
Feb 07, 2017
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

BEFORE:     SUHRHEINRICH, SUTTON, and McKEAGUE, Circuit Judges.

SUHRHEINRICH, Circuit Judge

Over the course of seven years, Defendant-Appellant Gezim (Jimmy) Selgjekaj, an Albanian immigrant, started several businesses and maintained a luxurious lifestyle by fraudulently obtaining loans from the St. Paul Croatian Federal Credit Union (the Credit Union), with the help of Anthony (Tony) Raguz, its chief operating officer. Defendant, along with two of his business partners, Artur Hoxha and Judmir Capoj, repeatedly bribed Raguz. In return, Raguz issued unauthorized loans to Defendant and conducted a massive cover-up operation at the Credit Union. This scheme involved issuing loans: (1) to accounts of fictitious individuals and businesses; (2) to real businesses of Defendant after they had become defunct; and (3) to Defendant in the names of Defendant's friends, relatives and business partners without their consent. Defendant never had the intention, nor the ability, to repay the loans.

As a result, the Government charged Defendant with twenty-eight offenses: conspiracy to commit financial institution fraud and bribery, in violation of 18 U.S.C. § 371 (Count 1); financial institution fraud, in violation of 18 U.S.C. §§ 1344 and 2 (Counts 2-16); bribery, in violation of 18 U.S.C. § 215(a)(1) (Counts 17-22); and money laundering, in violation of 18 U.S.C. § 1957 (Counts 23-28). Hoxha and Capoj were charged as co-defendants on several counts, and both pleaded guilty. Raguz was charged separately and also pleaded guilty. Defendant went to trial where the jury found Defendant guilty on all counts, save one bribery count (Count 21). Defendant filed motions for a judgment of acquittal and for a new trial. The district court denied both motions. The district court then sentenced Defendant to 300 months' imprisonment, followed by three years of supervised release.

Defendant appeals, challenging the sufficiency of the evidence for Counts 1-16, 18-19, and 23-28; the district court's denial of a new trial; and the procedural and substantive reasonableness of his sentence. We affirm the jury's verdict and the district court's sentence.

**I.**

We review the sufficiency of the evidence de novo, construing the evidence in "a light most favorable to the prosecution, giving the prosecution the benefit of all reasonable inferences from the testimony." *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007). A jury conviction is overturned only if viewing the evidence in this light, "[no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not "[re-]weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999).

**A.**

In violation of 18 U.S.C. § 371, Defendant was convicted of conspiring with Raguz to defraud the Credit Union for the benefit of Defendant (in violation of § 1344), and to bribe Raguz (in violation of § 215(a)(1)). The Government was required to prove beyond a reasonable doubt that two or more persons knowingly and voluntarily agreed to commit financial institution fraud and bribery, and there was at least one overt act in furtherance of the agreement by one of the conspirators. *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010);[1] *United States v. Spears*, 49 F.3d 1136, 1141-42 (6th Cir. 1995), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482, 486 n.3 (1997). A conspiracy need not be a formal agreement, and may be inferred by circumstantial evidence of acts done with a common purpose. *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990).

The Government presented overwhelming evidence at trial of a conspiracy, countered only by Defendant's claims of innocence from the stand. Raguz's testimony established that, because Defendant bribed him, he approved and issued numerous unauthorized loans for Defendant and his various businesses, which no financial institution in its right mind would have approved. The Government's loan reconstruction and cash flow analyses demonstrated that Defendant's companies did not have the financial wherewithal to make even monthly interest payments on its loans from the Credit Union, giving rise to the inference that Defendant never had the intention to repay his loans, contrary to his loan agreements. Furthermore, repeated deposits into Raguz's accounts very close in time to loan dispersals to Defendant corroborated Raguz's bribery testimony. The testimony of both Raguz and Hoxha (a co-defendant and Defendant's right-hand man) established that Defendant called the shots in and out of prison,

---

[1] Despite nominally articulating the elements of conspiracy to defraud under 18 U.S.C. § 1349, the *Warshak* court actually articulated the elements of conspiracy to defraud under 18 U.S.C. § 371 by requiring an overt act. *See United States v. Rogers*, 769 F.3d 372, 380-81 (6th Cir. 2014).

determining loan amounts, how loans should be disbursed, to whom loan checks should be made payable, and whether to use loan proceeds to bribe Raguz or for loan kiting to make his loans look current.

Raguz and Hoxha's testimony also established that Defendant knew of and consented to the myriad fraudulent accounting practices Raguz employed to avoid detection from auditors and his own board of directors. Raguz repeatedly "reset" Defendant's loans (i.e., rolled delinquent principal and interest into new loans to make them appear current) so that Defendant could continue to receive new loan proceeds, informed him of these resets in person, and included them on the quarterly bank statements Defendant received. Raguz, often at Defendant's direction, put loans into accounts of fictitious persons, defunct businesses Defendant owned, and real accounts of Defendant's relatives and business partners, so that the Credit Union's assets did not become too concentrated under Defendant's name, and raise the suspicion of auditors or the board.[2]

Defendant alleges the evidence is insufficient to show he intended to conspire with Raguz because Raguz engaged in some of the same fraudulent practices for other wrongdoers. Further, Defendant argues he had insufficient knowledge of how Raguz and his staff hid the fraud from the Credit Union board and regulators, and that these actions cannot be attributable to Defendant. Both arguments are meritless.

The fact that Raguz regularly assisted others in defrauding his employer, the Credit Union, does not mean that Defendant did not also defraud the Credit Union with Raguz's help. It is the Credit Union, not its agent, Raguz, who is the victim of bank fraud. *United States v. Abboud*, 438 F.3d 554, 593 (6th Cir. 2006). Despite the facts indicating otherwise, even if

---

[2] Raguz testified that a red-flag would be raised if loan balances for one member's account exceeded 5% of the Credit Union's assets.

Defendant was unaware of the Credit Union's backroom fraudulent accounting practices, that does not mitigate or absolve his guilt. Each conspirator is responsible for the acts of his co-conspirators, *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946), so long as the act, constituting a substantive crime, was a reasonably foreseeable consequence of the conspiracy, *United States v. Gallo*, 763 F.2d 1504, 1519 n.22 (6th Cir. 1985). Fraudulent accounting practices are reasonably foreseeable acts of disguising bank fraud and are therefore attributable to Defendant.

Construing the evidence in favor of the prosecution, we believe that a "rational trier of fact could have found the essential elements of [conspiracy] beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Consequently, we affirm.

**B.**

In violation of 18 U.S.C. § 1344, Defendant was convicted of fifteen counts of bank fraud (Counts 2-16), one for each Credit Union account affiliated with Defendant. The Government was required to prove beyond a reasonable doubt for each count that Defendant "knowingly execute[d], or attempt[ed] to execute, a scheme or artifice":

> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises . . . .

18 U.S.C. § 1344.

While subsections (1) and (2) of § 1344 prohibit much of the same behavior, they do not overlap perfectly. *Loughrin v. United States*, 134 S. Ct. 2384, 2389-90 (2014). For instance, only § 1344(1) can cover check or loan kiting, as this does not involve any false representation. *See id.* at 2390 n.4. Along the same lines, while both subsections cover obtaining money from a bank by making false representations to the bank, § 1344(2) also covers false representations to

persons other than the bank so as to gain control of property in the custody of the bank. *Id.* at 2389.

Essentially, Defendant's argument is that there is insufficient evidence of his intent to defraud the Credit Union on Counts 2-16, and he argues that the evidence demonstrates that the Credit Union, embodied in the person of Raguz, was the one who committed fraud on the Credit Union's auditors and board of directors. Defendant alleges that he merely asked Raguz for loans, and that Raguz granted them. Not only does this argument ignore conspiracy and corporate law, but also the staggering amount of evidence presented by the Government.

We bear in mind that "the question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned." *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) (quoting *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003)). The Government presented evidence to show that Defendant defrauded and intended to defraud the Credit Union. It presented Defendant's false statements to the Credit Union in obtaining loans, including falsely representing his intent to make monthly payments, having loans issued in the name of nominees, and obtaining loans in the name of fake or defunct businesses. It further presented evidence that Defendant intentionally submitted incomplete loan applications to the Credit Union to obtain loans. The Government states, and we concur, that this evidence supported convictions under either subsection of § 1344.

The proof necessary for conviction under § 1344(1) does not involve false representations. In support of the convictions, the Government offered evidence of loan kiting to make Defendant's payments look current, so he could obtain new loans. Lastly, it presented

evidence of Defendant bribing Raguz to buy influence to defraud the Credit Union. The Government states, and we concur, that the evidence supported the convictions under § 1344(1).

Although we will not reiterate all of the Government's evidence in full, as its voluminousness is astounding,[3] two examples of the Government's proof of intent to defraud will suffice.

**1.**

Supporting all of the bank fraud charges under both § 1344(1) and (2), the Government presented an abundance of evidence that Defendant took out loans nominally agreeing to make monthly payments, but in reality never intending to make payments. The Credit Union's loan application explicitly required the applicant to provide complete and *truthful* information, and alerted the loan applicant that failure to do so is a federal crime. Through loan reconstructions and cash flow analyses of Defendant's many business and personal bank accounts, the Government established that Defendant and his businesses never had the cash flow or financial wherewithal to make the required interest payments, much less the principal payments, under the terms of the loans. This gives rise to the inference that Defendant never had the intention to make his monthly payments at the time he took out the loans.

This lack of ability to pay, and inference of intent to defraud, was supported by the fact that Defendant was already in default on a number of his loan obligations to the Credit Union for loans obtained prior to the indictment period. In further confirmation of this inference, Defendant hardly ever made payments on his loans over the course of the indictment period (discounting the millions of dollars in fraudulent loan kiting payments he made). Additionally,

---

[3] Furthermore some of this evidence was discussed in Part I.A *supra*, as evidence of the conspiracy to commit this substantive crime.

Defendant would frequently use loan funds issued to his businesses on luxury cars, gambling sprees, or to send his brother money in Albania.

Defendant argues that because he made some legitimate loan payments (which even the Government admits), the jury could not conclude beyond a reasonable doubt that he did not intend to repay his loans. However, this totally overlooks the fact that the Government showed that 94.75% of Defendant's $7,947,754.36 loan payments were from fraudulent loan kiting, and that Defendant's cash flow was not even close to sufficient to cover just his interest payments.

Defendant also argues that his failure to make loan payments is irrelevant to the issue of whether he fraudulently induced his loans, citing *United States v. Kilkenny*, 493 F.3d 122, 129-30 (2d Cir. 2007). Defendant misreads *Kilkenny*. *Kilkenny* held that failure to repay bank loans does not constitute conduct for the offense of bank fraud under § 1344. *Id.* at 130. The court stated that the crime was complete when the defendant received funds based on the fraudulent loan application. *Id.* However, the *Kilkenny* court did not hold that the failure to make loan payments is not evidence of intent to defraud under § 1344. *Kilkenny* is therefore inapposite.

Defendant also argues that the fact that loan proceeds given to one entity were regularly used for other entities owned by Defendant is not evidence of fraud, because the loans lacked use restrictions for funds. However, Defendant ignores that Raguz also testified that the Credit Union only made loans with the understanding that the funds would be used for their intended purpose, which, when the debtor is a business, is the business venture of the borrowing entity. Therefore, even without explicit use restrictions, these loans were obtained under false pretenses, in violation of 18 U.S.C. § 1344(2).

**2.**

In support of all the bank fraud charges under § 1344(1), the Government also presented extensive evidence that Defendant repeatedly obtained new loans from the Credit Union for the purpose of making payments on older loans Defendant had at the Credit Union to prevent the old loans from appearing delinquent, i.e., loan kiting. Loan kiting constitutes bank fraud. *See Loughrin*, 134 S. Ct. at 2390 n.4; *United States v. Cole*, 989 F.2d 495, 495 (4th Cir. 1993) (unpublished table decision); *United States v. Munoz Franco*, 356 F. Supp. 2d 20, 38-39 (D. P.R. 2005).

Raguz testified that the vast majority of Defendant's loan payments came out of new loans. This was confirmed by the Government's loan reconstruction and analyses, which found that 94.75% of Defendant's $7,947,754.36 of loan payments to the Credit Union came from new loan funds from the Credit Union. National Credit Union Association (NCUA) analyst Elizabeth Martin and FBI Special Agent Derek Kleinmann testified as to how this was a "shell game," where Defendant simply moved money around to make his loans look current, while still owing the same amount. Hoxha testified that Defendant told him that the reason they left behind loan checks at the Credit Union whenever they picked up new loan checks was for the purpose of paying back loans, as they were not keeping up with the loan payments.

Thus, construing evidence in favor of the prosecution, we believe that on Counts 2-16 a "rational trier of fact could have found the essential elements of [either §§ 1344(1) or (2)] beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Therefore, we affirm.

**C.**

Defendant concedes that for Counts 17, 20, and 22 sufficient evidence was presented at trial. Defendant argues that insufficient evidence was presented on Counts 18 and 19. For this

Court to sustain a multi-year conviction under 18 U.S.C. 215(a)(1), the Government was required to prove that "the defendant gave, offered or promised something of value in excess of [$1,000] to an officer, director, [or] employee . . . of a financial institution, . . . with the intent to influence or reward the person in connection with any business or transaction of the institution." *Spears*, 49 F.3d at 1141 (citing 18 U.S.C. § 215(a)(1)).

Counts 18 and 19 charge Defendant with bribing Raguz through Hoxha while Defendant was in Albania in 2003. The Government established that during that time generally, Defendant would phone Hoxha and instruct him to go to the Credit Union to pick up loans from Raguz and leave bribe checks for Raguz. In support of Count 18 in particular, the Government showed that on June 19, 2003: (1) Hoxha signed and gave Raguz a check for $5,000; (2) Raguz reset the $353,482.40 of loans on Alba Logistics' account and issued Alba Logistics an additional $50,000 in loan proceeds; and (3) Raguz deposited the $5,000 check into his personal Credit Union account. Similarly, in support of Count 19 in particular, the Government showed that: (1) on July 9, 2003, Hoxha endorsed a $5,000 loan check, Alba Logistics' loan was reset, and Alba Logistics was issued $30,000 in additional loan proceeds; (2) on July 10, 2003, the $5,000 check was cashed at the Credit Union; and (3) on July 11, 2003, Raguz took the same $5,000 and applied it to a loan he had taken out for himself. This provided the jury with sufficient evidence to convict Defendant on these two counts.

However, Defendant argues that because he was acquitted on Count 21, which charged Defendant with bribing Raguz and using Hoxha as a courier while Defendant was in prison, the evidence here must also be insufficient, as he was similarly physically absent when Hoxha bribed Raguz.

This appears to be an inconsistent verdict challenge. Inconsistent jury verdicts, however, are generally unreviewable, except when they are marked with such inconsistency as to indicate arbitrariness or irrationality. *United States v. Lawrence*, 555 F.3d 254, 261-64 (6th Cir. 2009). Here, Count 21 was factually unrelated to Counts 18 and 19, and separate evidence was presented for all three counts. Therefore, it is hard to imagine how inconsistent verdicts could indicate arbitrariness or irrationality.

Therefore, construing the evidence in favor of the prosecution, we believe that on Counts 18-19 a "rational trier of fact could have found the essential elements of [§ 251(a)(1)] beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Therefore, we affirm.

**D.**

Defendant was convicted of six counts of laundering fraudulently obtained funds from the Credit Union, in violation of 18 U.S.C. § 1957(a). Section 1957(a) makes punishable "knowingly engag[ing in] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." The Government presented evidence that, on the six occasions listed in the Indictment, Defendant transferred funds in excess of $10,000, that were obtained from the Credit Union in a manner found by the jury to constitute bank fraud, to bank accounts that Defendant held in other banks.

Both sides concede that Defendant's convictions on Counts 23-28 rise or fall based on whether this Court sustains or overturns Counts 2-16, the bank fraud convictions. Consequently, because we upheld Defendant's bank fraud convictions, we similarly affirm these convictions.

Because the evidence fully supports all of Defendant's convictions, his challenge to the district court's denial of a new trial is moot.

## II.

Defendant challenges his sentence as procedurally and substantively unreasonable. We review the procedural and substantive reasonableness of a defendant's sentence for abuse of discretion. *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). In reviewing the district court's sentence, the court's factual findings are reviewed for clear error, while its interpretation and application of the Guidelines are reviewed de novo. *Id.* However, in reviewing the application of a sentencing enhancement for being an "organizer or leader" under USSG § 3B1.1(a), this Court applies a "deferential" standard as, "[t]he trial judge is most familiar with the facts and is best situated to determine whether someone is or is not a 'leader' of a conspiracy that the jury found existed." *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013).

## A.

Defendant challenges his sentence as procedurally unreasonable for three reasons. He argues that the district court erred in: (1) including three loan amounts in determining the actual loss amount attributable to Defendant, causing a two-level increase in Defendant's sentencing recommendation under USSG § 2B1.1(b)(1)(K); (2) finding him to be an "organizer or leader" of a criminal activity under USSG § 3B1.1(a), causing a four-level increase in Defendant's sentencing recommendation; and (3) denying his writ of habeas corpus ad testificandum, seeking to compel Raguz to testify at sentencing.

A district court abuses its discretion in sentencing by committing significant procedural errors, such as, "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on

clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51.

**1.**

The district court determined that Defendant was responsible for an actual loss to the Credit Union of $10,679,123, resulting in a 20-level offense level increase to his recommended sentence. USSG § 2B.1.1(b)(1). Included in this figure are three loss amounts Defendant disputes: (1) $1,035,046.12 of pre-indictment loans which Raguz reset and rolled into new fraudulent loans when the conspiracy began; (2) $332,946.98[4] of loans from Alba Logistics' account, that Defendant argues should be attributed to Hoxha; and (3) a $279,899.16 loan which the Credit Union issued on Defendant's Jimmy's Trucking account to help settle Great Lakes Produce's PACA claims. For Defendant to receive the two-level offense reduction he seeks, he must show that both the pre-indictment loans and one of the other two amounts were erroneously included to bring his attributed loss amount below $9.5 million. *See* USSG § 2B1.1(b)(1).

In cases of fraud, actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1, cmt. n.3(A)(i). For an actual loss to be attributed to a defendant for sentencing purposes, the district court must determine by a preponderance of the evidence that a defendant is both a "but for" and proximate cause of this loss. *United States v. Rothwell*, 387 F.3d 579, 582-83 (6th Cir. 2004). However, "[i]n situations where the losses occasioned by financial frauds are not easy to quantify, the district court need only make a reasonable estimate of the loss." *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006) (citing USSG § 2B1.1, cmt. n.3(C)).

---

[4] The parties in their briefing appear to dispute the exact amount that Defendant is challenging as wrongly attributed from this account. However, because the district court's ruling attributed $332,946.98 to Defendant, so will we for purposes of this challenge. *Compare* R. 163, PageID 4568, *with* R. 157: Def's Am. Suppl. Sentencing Mem., PageID 4500.

The district court included in Defendant's loss amount $1,035,046.12 of loans Defendant had taken out from the Credit Union prior to the indictment period. The court found that these loans were properly attributable to Defendant because, through Raguz, Defendant had them "reset and/or rolled into new loans fraudulently obtained, and therefore, [they] constitute actual loss derived from his ongoing fraudulent activity." R. 163, PageID 4567-68. Defendant argues that this inclusion is clearly erroneous, and asserts, without any citation, that "[f]raud must take place at the time of a loan's creation to be a violation of 18 U.S.C. § 1344." Appellant Br. at 74. We can find no authority to support this assertion, and moreover find it to be legally incorrect.

Resetting Defendant's preindictment loans was a pre-requisite and part of Defendant's scheme to fraudulently obtain loans. In addition, by fraudulently resetting Defendant's pre-indictment loans, Raguz and Defendant created a new risk of loss for the Credit Union, by not only hiding the new and old risks from the board of directors and auditors, but by also "depriv[ing] the Credit Union of an opportunity for reimbursement through foreclosure." *United States v. Longfellow*, 43 F.3d 318, 324 (7th Cir. 1994); *see also United States v. Hoglund*, 178 F.3d 410, 413 (6th Cir. 1999) (holding that exposing a bank to a risk of loss is one way to establish intent to defraud in bank fraud cases). Consequently, regardless of the initial legitimacy of the pre-indictment loans, by fraudulently resetting those loans, Defendant created a new and additional risk of loss for the Credit Union in those loans, making the Credit Union's ultimate loss on those amounts properly attributable to Defendant's criminal conduct. The district court's conclusion was therefore correct, despite the fact that it did not make explicit the last part of this analysis.

Because Defendant's challenge to this inclusion fails, his other two loss amount challenges are moot, and we affirm the district court's 20-level increase under USSG § 2B1.1(b)(1)(K).

**2.**

Defendant challenges the district court's finding that he was an "organizer or leader of a criminal activity that involved five or more participants," USSG § 3B1.1(a), causing a four-level increase in his sentencing recommendation. This enhancement is appropriate where the defendant was "the organizer [or] leader . . . of *one or more* participants." *Id.* § 3B1.1, cmt. n.2 (emphasis added). Therefore, although there must be five participants in the criminal activity, for a defendant to be a leader or organizer, he need only lead or organize one other participant. *United States v. Ward*, 68 F.3d 146, 151 (6th Cir. 1995). Relevant factors in finding a leadership or organizational role include "the exercise of decision making authority . . . and the degree of control and authority exercised over others." USSG § 3B1.1, cmt. n.4. A participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* § 3B1.1, cmt. n.1. In the Sixth Circuit, this uniformly includes those "who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance." *United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002).

The district court found that Defendant controlled both Capoj and Hoxha, and that the criminal activity included at least six persons (Defendant, Raguz, Capoj, Hoxha, and two Credit Union tellers), and therefore applied the four-level enhancement. As the district court noted, Capoj's and Hoxha's testimonies easily supported the finding that Defendant controlled them. Capoj testified that he would only sign loan documents and retrieve loan checks at Defendant's direction, and that Defendant solely determined the amount of the loan and what to do with the

proceeds.  Similarly, Hoxha testified that Defendant would direct him to go to the Credit Union to obtain new loans and to pick up loan checks, and further instructed him how he was to do it, and when to leave behind loan checks as loan kiting payments or bribes.  When Hoxha questioned Defendant about him signing blank loan documents for Defendant, Defendant told him to not worry about it.

Defendant argues—unconvincingly—that Capoj and Hoxha could not have been participants controlled by Defendant because they were not indicted on the same counts.  However, this exercise of prosecutorial discretion does not show that the district court's finding was clear error.

Additionally, as the district court held, Raguz's testimony regarding how the two tellers, Debbie Politi and Linda Fuduric, repeatedly helped to "cook the books" prior to NCUA audits, even spending the night at a hotel fabricating documents until midnight, substantiated its finding that these two qualified as participants.  Furthermore, loan reset lists indicated that tellers "D.P." and "L.F." reset numerous loans for Defendant.  Raguz also identified Politi as the one who primarily took care of Defendant's loans.  This evidence certainly indicates that the tellers "were (i) aware of the criminal objective, and (ii) knowingly offered their assistance," and were therefore "participants." *Id.*

Defendant argues that this finding is in clear error for two reasons.  First, by failing to charge the tellers or grant them immunity, the Government led the tellers to assert their Fifth Amendment Privilege at trial, which prevented Defendant from extracting exculpatory testimony from the tellers to the effect that: Defendant was unaware of the backroom practices of the Credit Union; and that Defendant made regular cash payments on his accounts.  Second, because the

tellers assisted Raguz in committing fraud in many accounts besides Defendant's, they should not be considered participants in Defendant's criminal activity.

Both arguments are meritless. First, the Government's exercise of prosecutorial discretion and the tellers' invocation of their Fifth Amendment privilege were not instances of tactical foul play. Furthermore, Defendant's speculative claim that these tellers possess exculpatory evidence is undermined by the overwhelming evidence presented at trial to the contrary. Second, simply because the tellers were engaged in unrelated criminal activity does not mean that they were not involved in Defendant's criminal activity.

Therefore, we affirm the district court's role enhancement to Defendant's sentence.

**3.**

Defendant challenges the district court's denial of his petition for a writ of habeas corpus ad testificandum, in which he sought to compel the presence and testimony of Raguz at sentencing. Defendant sought Raguz's testimony to help determine the proper loss amount. In particular, Defendant argued that he was unaware of how Raguz continued to manipulate his accounts during his incarceration to keep them looking current. Defendant also wished to ask Raguz whether, towards the end of the indictment period, he used the "tens of thousands of dollars" in cash deposits that Defendant alleges to have made to cover delinquent loans for accounts unaffiliated with Defendant, while crediting back Defendant's accounts with payments from accounts Raguz intended to burn, using loan proceeds issued to those accounts from the Credit Union. Because the Government, in determining the amount of fraudulent loan payments made by Defendant, did not give Defendant credit for payments based on Credit Union loan proceeds issued to a Credit Union account, Defendant believes that Raguz's testimony would

have established that his loss amount calculation should have been reduced by the amount of these cash deposits.[5]

While this circuit has not determined the standard of review for denial of writs of habeas ad testificandum at sentencing, we have held that we review such denials occurring during trial for abuse of discretion. *United States v. Guthrie*, 557 F.3d 243, 251 (6th Cir. 2009). Following our sister circuits, we will review for abuse of discretion at sentencing as well. *United States v. Johnson*, 554 F. App'x 139, 140 (4th Cir. 2014) (per curiam); *United States v. Garrard*, 83 F.3d 889, 893 (7th Cir. 1996); *United States v. Navaez*, 38 F.3d 162, 164-65 (5th Cir. 1994). District courts, in exercising their discretion here, should weigh the effect the proffered testimony would have on the Guidelines against the resources necessary to produce this testimony. *Johnson*, 554 F. App'x at 140 (citing *Garrard*, 83 F.3d at 893).

The district court summarily denied Defendant's petition, adopting as its own the arguments offered by the Government in its response brief in opposition to Defendant's petition. As the Government pointed out in its motion, Raguz's proffered testimony would have no effect on Defendant's sentencing recommendation for three reasons. First, regarding Raguz's accounting activity during Defendant's incarceration, Defendant essentially sought to re-litigate his own guilt. Any evidence of Defendant's alleged lack of knowledge of resets and loan covers during his incarceration would be inconsistent with the jury's verdict on counts 1, 4, 5, 6, 7, 10, 11, and 12. Therefore, to admit evidence to the contrary, and then issue a sentencing recommendation upon that evidence, would have contradicted the factual findings of the jury, and the well-established doctrine that co-conspirators are responsible for all foreseeable acts in

---

[5] On appeal, Defendant additionally claims he sought Raguz's testimony regarding Defendant's role in the criminal activity, especially as it concerned Defendant's relationship to the tellers. However, because Defendant did not present this reason to the district court in his petition, this issue is not properly before us. *See Rogers v. Internal Revenue Serv.*, 822 F.3d 854, 858 (6th Cir. 2016).

furtherance of the conspiracy by their co-conspirators. This would have been procedurally unreasonable. *See Gall*, 552 U.S. at 51.

Second, the Government also noted in its motion that Raguz lacked personal knowledge of how the Government's loan reconstructions were created. Therefore, he would have been an improper witness as to how his accounting practices pertaining to Defendant's cash deposits were reflected in the Government's loan reconstructions. *See* Fed. R. Evid. 702. Third, as the Government pointed out, even assuming the district court did credit Defendant with the backed-out loan payments, Defendant would have had to have made hundreds of the "tens of thousands of dollar[]"cash deposits he claims to have made, in order to bring his $10.6 million loss figure below $9.5 million. However, Raguz *already* testified at trial that there were very few loan payments made.

Therefore, the district court did not abuse its discretion, and we affirm.

**B.**

Defendant claims the district court failed to properly consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), so as to ensure his 300-month sentence was properly tailored to the sentencing policy goals given in § 3553(a)(2). Defendant's argument falls flat. At sentencing, the district court weighed all relevant § 3553(a) factors. While the district court cursorily mentioned the nature and circumstance of the offense, he incorporated by cross-reference all that had occurred at Defendant's two-and-a-half-week trial, and the extensive briefing and opinions issued by the parties and the court in this case. Moreover, in articulating the need for the sentence imposed, per § 3553(a)(2), the district court extensively reviewed Defendant's personal history, including mitigating factors (e.g., Defendant being born and raised in a communist county), and

aggravating factors (e.g., Defendant's obstinate criminal behavior, even while behind bars). Therefore, we find that the district court complied with § 3553(a).

Additionally, Defendant seems to allege that the district court failed to properly consider § 3553(a)(6), which seeks to avoid disparity between defendants with a similar background and offense conduct, because Raguz received a sentence eleven years less than him. However, the fact that his sentence is longer than Raguz's does not make Defendant's sentence substantively unreasonable. Defendant had a higher criminal history category than Raguz. Further, Defendant repeatedly perjured himself at trial, which resulted in an obstruction of justice enhancement. Additionally, Raguz pleaded guilty and gave substantial cooperation to the Government. This provided ample reason for the district court to give Defendant a longer sentence than Raguz.

Therefore, we affirm Defendant's sentence.

**III.**

We affirm both the jury's verdict, and the district court's sentence.